**UNITED STATES of America,**
**Plaintiff,**

v.

**James S. DUARDI et al., Defendants.**

**No. 23939–1.**

United States District Court,
W. D. Missouri, W. D.

Nov. 12, 1974.

Lawrence F. Gepford, Kansas City, Mo., for Brancato.

David R. Freeman, Federal Public Defender, Kansas City, Mo., for Bishop.

Patrick A. Williams, Tulsa, Okl., for King.

Roehm A. West, Tulsa, Okl., for Husong.

Stephen Jones, Oklahoma City, Okl., for Grayson.

## MEMORANDUM AND ORDERS GRANTING DEFENDANTS' MOTION TO DISMISS GOVERNMENT'S SECTION 3575(a) NOTICE AND DENYING GOVERNMENT'S MOTION FOR LEAVE TO AMEND SAID NOTICE

JOHN W. OLIVER, District Judge.

### I.

Pursuant to orders entered September 17, 1974, this case now pends on (1) defendants' motion to strike the government's original Section 3575(a) notice; and (2) the government's motion for leave to file an amended Section 3575(a) notice. For reasons we shall state in detail, defendants' motion to strike will be granted and the government's motion for leave to amend its original notice will be denied. Accordingly, a final order will be entered setting the case on the regular docket for imposition of final sentences.

Attention was first focused on the questions presented in Part III of our memorandum opinion of January 2, 1973, 384 F.Supp. 856. We concluded at that time that even though a particular defendant may be found to be a "special offender," within the meaning of § 3575(e), he may not properly be sentenced under that section unless he also may be found to be "dangerous," within the meaning of § 3575(f). We directed specific attention to the express requirement of subsection (f) that a defendant may be considered to be "dangerous" only if it may be determined that "a period of confinement longer than that

Bert C. Hurn, U. S. Atty., Gary Cornwell, Strike Force, Kansas City, Mo., for plaintiff.

Michael J. Drape, Kansas City, Mo., for Duardi.

provided for such felony is required for the protection of the public from further criminal conduct by the defendant."

In order to get the questions presented in appropriate focus, we entered an order on January 2, 1973, which required the government to "prepare, serve, and file a statement of the evidence it intends to adduce in order to support a finding of dangerousness, as required by § 3575(f) of Title 18, United States Code." A second memorandum opinion was filed on February 28, 1973, 384 F.Supp. 861. That opinion, among other things, focused particular attention on whether the original § 3575(a) notice filed by the government complied with the express requirements of § 3575(a), which provides that the government's attorney shall set out "with particularity the reasons why such attorney believes the defendant to be a dangerous special offender." We also noted that the government, by its response filed January 23, 1973, purported to comply with our January 2, 1973 order to file a statement of the evidence it intended to adduce to support a § 3575(f) finding of dangerousness. We described that response generally as a statement of "various and sundry charges against the various defendants, some of which [the government] would attempt to support by hearsay upon hearsay and some of which related to criminal charges which pend trial in the State courts of Oklahoma." We directed attention to the government's "loose talk" which described the defendants as "organized crime offenders." On February 28, 1973, we entered an order which, among other things, directed that the government state whether it wanted to seek leave to amend its defective original § 3575(a) notice.

Our most recent memorandum opinion of September 17, 1974 outlined the circumstances and procedures under which further proceedings in connection with the government's effort to invoke the Sections 3575–3578 sentencing procedures was deferred in light of the parties' agreement that the tentative sentences, calling for the recommendation of the Director of the Bureau of Prisons, be imposed pursuant to § 4208(b), Title 18, United States Code. Our September 17, 1974 opinion was written after we had received the recommendation of the Director of the Bureau of Prisons in regard to each of the defendants involved and after it was apparent that the Director's recommendation in regard to each defendant was for a sentence considerably less than the five year maximum authorized for violations of the statute under which the defendants were convicted.

Consistent with the understanding under which the Section 4208(b) sentences were imposed, we entered appropriate orders on September 17, 1974, which provided (1) that the government could, if it so desired, file a motion seeking leave to file a proper amendment to its presently defective § 3575(a) notice; and (2) granting defendants leave to file a motion to strike both the original and the amended notice, should one be filed. Both motions were filed and those pend for determination.

## II.

The government's motion for leave to amend its original notice, filed September 30, 1974, attached as an exhibit a proposed "Amended Notice." The proposed amended notice is directed against only defendants Duardi, Brancato, Bishop and King. The government's suggestions in support of its current response to our orders of September 17, 1974, included a motion, which will be granted, to dismiss its original notice against defendants Grayson and Husong.[1]

---

1. Although we do not believe it necessary, but to avoid possible confusion in the record, we will grant the government's motion to dismiss its notice against defendants Grayson and Husong. It should, however, be noted that in support of its change of position in regard to those two defendants, the government suggests in support of its motion to dismiss against them that a "period of confinement longer than the five year

In the earlier memorandum opinions to which we have made reference, and which we expressly incorporate at this place by this reference, we determined that the government's original notice was fatally defective because (a) it made no mention whatever of the essential element of dangerousness as required by § 3575(f), and (b) the government totally failed to meet the requirement of § 3575(a)(2) that the government attorney set out with particularity the reasons why the government attorney believed a particular defendant to be a dangerous special offender.

In its effort to cure those defects, the government's proposed amended notice would add, as a new paragraph 5, a conclusory statement that each defendant is dangerous within the meaning of the definition stated in § 3575(f). In addition, the government, in purported compliance with the requirements of § 3575(a)(2), simply copies, word for word, those portions of the government's response of January 23, 1973 to our order of January 2, 1973, which relate to the four defendants against whom the government would seek to have sentenced under the procedures provided in Sections 3575–3578. Thus, the government's response of January 23, 1973, which we discussed quite fully in our earlier opinions, is injected back into this case as an integral part of the proposed amended notice which the government seeks leave to file in order to trigger the Sections 3575–3578 special sentencing procedures.

The portion of the government's response of January 23, 1973, as it related to defendant Bishop, now incorporated in the government's proposed amended notice, states in substance that Bishop was convicted in the District of Kansas on May 5, 1971 of interstate transportation of forged securities, that he was given concurrent five year sentences on the multiple counts there involved, that the execution of those sentences was suspended and Bishop placed on probation for a period of three years. Reference was then made to the fact that probation was revoked by Judge O'Connor on October 24, 1972, because of Bishop's unauthorized travel to Oklahoma, his use of assumed names, and his possession of firearms on such visits. The government adds that Bishop was convicted of a Missouri felony charge for a July 4, 1972 burglary for which he was given a three year sentence on May 31, 1974.[2]

The proposed amended notice then incorporated that portion of the January 23, 1973 response which stated that "on March 16, 1972 Clifford Bishop did shoot Jess C. Roberts with the intent to kill." The testimony that the government's principal trial witness would give in connection with that matter is then stated in detail. It is further stated that "Roberts had seen Bishop prior to this shooting incident, had been on a trip from Oklahoma to Denver and Kansas City, during which defendant King had informed Bishop and Roberts that federal law enforcement officials were investigating their activities." The next

maximum provided under 18 U.S.C. § 371 is no longer required for the protection of the public from further criminal conduct by these defendants in light of the fact that both defendants have been removed from public office by reason of their conviction."

This is the first time that the government ever expressed the notion that defendants Grayson and Husong were to be considered "dangerous" for the reason that they were at the time of conviction public officers of the State of Oklahoma. The government's present position in regard to defendants Grayson and Husong is another illustration of the varied meanings which may be given the vague term "dangerous." See part V of this memorandum opinion.

2. It is important to note that both the government's original notice and its proposed amended notice are based solely on the theory that each of the defendants are "special offenders," within the meaning of Section 3575(e)(3). No notice or claim has ever been made that defendant Bishop or any other defendant is in fact a "special offender," within the meaning of either Section 3575(e)(1) or Section 3575(e)(2). Proof which might be relevant under an (e)(1) or an (e)(2) charge simply has no relevancy under circumstances in which the government's notice and proof is limited solely to an (e)(3) charge.

prior occasion on which Roberts had seen Bishop and King included an occasion when defendant Husong was present at which time Roberts allegedly had been accused of trying to "back out of the illegal arrangement which is the subject matter of the present conviction."

The portion of the government's response of January 23, 1973 incorporated in the proposed amended notice in regard to defendant King states that the government would offer evidence establishing that King lured Roberts to a point where Bishop was "lying in wait to murder Roberts and then assisted in disposing of Roberts' apparently dead body." The same testimony that Bishop, King and Husong accused Roberts of attempting to back out of their illegal arrangement would also be offered against defendant King.

As noted above, the portion of the response of January 23, 1973 in regard to defendants Grayson and Husong is omitted in its entirety from the proposed amended notice. It is significant to note, however, that neither Grayson nor Husong was considered by the government in its January 23, 1973 response to be "dangerous" because they were public officials. The government's original position was based on the theory that it would offer evidence in regard to defendant Grayson which would indicate his "knowledge of the details of the shooting, and necessarily some complicity with the assailants." A similar contention was made in regard to defendant Husong. The government's January 23, 1973 response stated that its intended evidence would establish "complicity in the murder scheme by Husong."

The portion of the January 23, 1973 response incorporated in the proposed amended notice in regard to defendant Brancato states, among other things, that "the United States will offer the testimony of a Special Agent of the F.B.I. that he has been advised by reliable confidential informants that Brancato was the most powerful member of the criminal organization in the southern part of Kansas City, Missouri." In further regard to defendant Duardi, the proposed amended notice incorporates that portion of the government's response of January 23, 1973 which would have the Court consider testimony of the government's witness Roberts which had been excluded at trial, which purported to show "Duardi's status as a current representative of an organized criminal group or enterprise." In addition, the government stated that it would offer:

Similar proof of the defendant Duardi's long standing association with organized crime activities will be furnished by the testimony of an agent of the Bureau of Narcotics and Dangerous Drugs who will testify to contacts made with Duardi in California over ten years ago.

Details of what defendant Duardi allegedly stated over ten years ago to the government's undercover agent are outlined in some detail. The government emphasized that "additional corroboration of Duardi's long time organized criminal activity will be furnished by introduction of official Federal Bureau of Narcotics reports, prepared contemporaneously, of previous undercover contacts with Duardi during the 1950's by a now deceased agent."

The government's proposed amended notice, by the same process of blanket incorporation of its January 23, 1973 response, states that those almost 25 year old reports establish "Duardi's organized crime connections." As was true of all other defendants the government stated it would establish Duardi's alleged complicity in the attempted murder of the co-conspirator Roberts. And in conclusion, the government incorporated the following final paragraph from its response of January 23, 1973, in regard to defendant Duardi:

Finally, the pattern of offender Duardi's past conduct evidencing his demonstrated contempt for all lawful obligations will be further substantiated by introduction of federal income

and Missouri state sales tax records, reflecting Duardi has consistently underpaid his Missouri state sales tax liability. Comparison of his state sales tax and federal income tax returns indicate this underpayment resulted in the State of Missouri receiving only about one-fourth of the tax revenue owed from Duardi's operation of the Old Fortress Tavern.

### III.

For reasons we have fully stated in earlier opinions, we first find and conclude that the government's original § 3575(a) notice did not comply with the express requirements of that section and that such notice therefore should be dismissed as legally insufficient to trigger the other provisions of §§ 3575–3578. Defendant's motion to dismiss the government's original § 3575(a) notice will accordingly be granted.

■ The few cases which have passed upon similar questions relating to proper compliance with notice requirements in recently enacted federal enhanced-sentencing statutes are in agreement that if it is determined that the government has failed to comply with the notice requirements of those statutes, dismissal of the notice is the appropriate remedy under the circumstances. See United States v. Edwards, (M.D.Fla.1974) 379 F.Supp. 617, involving § 3575(a), and United States v. Noland, (5th Cir. 1974) 495 F.2d 529, and United States v. Tramunti, (S.D.N.Y.1974) 377 F.Supp. 6, both of which involved § 849 of Title 21, United States Code, a drug enhanced-sentencing statute almost identical to §§ 3575–3578.

### IV.

The dismissal of the original notice requires that we reach the question of whether, under the circumstances of this case, the government's motion for leave to amend its original notice should be granted. The first question presented is whether the government attorney's defective notice is subject to amendment after trial and conviction. Section 3575(a) provides that "Whenever an attorney charged with the prosecution . . . has reason to believe that the defendant is a dangerous special offender such attorney, *a reasonable time before trial* . . . may sign and file with the court, *and may amend,* a notice . . . . . " The Honorable Elmo B. Hunter of this Court, in United States v. Kelly, 384 F.Supp. 1394, recently concluded, as a matter of statutory construction, that a defective original notice could not be amended after trial. We are in complete agreement with Judge Hunter's conclusion and with the rationale of his well reasoned opinion.

Except for the procedural history of this case, particularly the circumstances under which the § 4208(b) sentences were imposed, we would have based our denial of the government's motion for leave to amend its defective original notice on the same single ground on which Judge Hunter refused to permit a post-trial amendment of the defective notice involved in United States v. Kelly.

■ Because of the procedural circumstances of this case, and the obvious desire of the government to have broader questions considered, we find and conclude as an alternate and independent ground, for the same reasons stated by Judge Hunter in United States v. Kelly, that the government's motion for leave to amend should be denied because no amendment pursuant to § 3575(a) may properly be made after trial and conviction.

It is appropriate, however, under *the circumstances of this case,* to assume for purposes of decision that a timely amendment may be permissible under § 3575(a) in order that other important questions presented by §§ 3575–3578 be decided.

### V.

Even if it is assumed that a post-trial amendment of a defective original notice is permissible under § 3575(a), the government's motion for leave to amend

should not be granted for the separate and independent reasons we now state.

In this part of our opinion we shall reach and determine whether the government attorney's particularized statement in its proposed amended notice of the reasons why he believes a particular defendant to be a dangerous special offender complies with the requirements of § 3575(a)(2). If the proposed amended notice does not comply with those requirements, it is as defective as the government's original notice and leave to file a second defective notice therefore should not be granted.

By its incorporation of its January 23, 1973 response, the government made explicit the factors which its attorney believes may properly be considered in determining whether enhanced sentences should be imposed on these defendants "for the protection of the public from further criminal conduct." Except for its recitation of the irrelevant and immaterial circumstances relating to defendant Bishop's other convictions and revocation of probation, those factors consist of accusations that (a) all the defendants were in some way involved in a plot to murder the government's witness Roberts in the State of Oklahoma; (b) that all of the defendants are somehow connected with undefined "organized crime;" (c) that each defendant should be sentenced as an "organized crime offender," whatever those words may mean; and (d) that defendant Duardi violated State and federal laws in connection with his filing of Missouri sales tax returns. See United States v. Mirabile, 503 F.2d 1065 (8th Cir. filed October 15, 1974).

The government's response also makes it apparent that the government's attorneys believe that if they can establish those charges by a "preponderance of the information," this Court is obligated under § 3575(a) to consider a maximum sentence of 25 years, rather than the five year maximum sentence otherwise applicable. The government would adduce its "information" in evidence by testimony from the victim of an alleged attempted murder, by hearsay testimony of government agents, by secret government files of the Bureau of Narcotics of approximately 20 year vintage, and by state sales tax records and federal income tax records of defendant Duardi.

■ After careful consideration of the government's arguments, we find and conclude that the "reasons" stated in the government's proposed amended notice are not reasons which could validly support a judicial finding that a particular defendant is, in fact, a dangerous special offender. Indeed, as discussed below, we find that it would be constitutionally impermissible to apply the statute in the manner proposed by the government.

■ We have already considered and rejected the government's notion that "information" that a particular defendant is connected with "organized crime," whatever those words may mean, was intended to be judicially considered as a relevant sentencing factor. In our memorandum opinion of February 28, 1973, we pointed out that "[n]either §§ 3575–3578 nor any other federal statute with which we are familiar ever attempted to define ['organized crime' or] an 'organized crime offender.'" We also stated that:

The notion that the government can proceed upon the theory that "organized crime offenders pose a special threat to the public" (Govt's Response, p. 10) and that it may ignore the Congressional command that it must include in its notice and thereafter establish both that a particular defendant is a "special offender" within the meaning of one of the three categories of § 3575(e), and is also "dangerous" within the meaning of § 3575(f), is totally without support and is directly contrary to the legislative history of the applicable statute. [P. 869].

In addition, principles enunciated in Townsend v. Burke, 334 U.S. 736, 68 S. Ct. 1252, 92 L.Ed. 1690 (1948), recently

reiterated in United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), prohibit this Court's reliance upon the type of "information" which the government proposes to introduce concerning the alleged involvement of these defendants in "organized crime." In *Townsend*, the Supreme Court determined that a prisoner "sentenced on the basis of assumptions concerning his criminal record which were materially untrue" was deprived of due process. 334 U.S. at 741, 68 S.Ct. at 1255.

Lower court cases construing *Townsend* have all emphasized the principle that sentences based upon inaccurate and erroneous information violate due process. For example, Smith v. United States, (5th Cir. 1955) 223 F.2d 750, involved a § 2255 motion alleging that an F.B.I. agent had erroneously advised the trial court that the defendant had committed a number of crimes and that the defendant had given the agent oral statements admitting his guilt. The defendant alleged that none of the alleged crimes "had ever been tested in a court of law." The transcript of the sentencing procedures made it clear that the F.B.I. agent had in fact "gone over the case" with the trial court. Relying on the rationale of *Townsend*, Judge Rives concluded that:

> The due process clause of the Fifth Amendment protects those convicted in the federal courts no less than that of the Fourteenth Amendment protects those convicted in the state courts. If, as the motion alleges, the defendant had not been convicted of, and had not committed, the crimes about which it is alleged that Agent Lill informed the district court, and if Agent Lill did in fact give false information as alleged to the district court, then the defendant's sentence would be lacking in due process and subject

to attack under Section 2255. [Ibid. at 754].

See also United States v. Myers, (3rd Cir. 1967) 374 F.2d 707, and the numerous cases cited and collected in the Note entitled "Procedural Due Process at Judicial Sentencing for Felony," 81 Harvard Law Review 821 (1968).

■ *Tucker, supra*, confirms Judge Rives' conclusion that *Townsend* is applicable to federal sentences. Application of the principles stated requires that we find and conclude that the government's declared intention to offer the testimony of F.B.I. and Bureau of Narcotic Agents as to what faceless confidential informants told them about alleged contacts with particular defendants and the other "organized crime" evidentiary data above summarized, does not meet due process requirements. We believe it obvious that it would be impossible to test the truth of what the government agents may testify that informants may have told them; it is equally impossible to subject an unnamed informant to cross-examination.

For the reasons stated, we find and conclude that those portions of the government's proposed amended notice dealing with defendants' alleged involvement in organized crime do not state factual reasons sufficient to comply with the notice requirements of § 3575(a).

With regard to the remaining factual accusations, the government's response reflects that they would have this Court base a finding of "dangerousness" under § 3575(f) upon certain alleged criminal conduct of the defendants. Yet none of the defendants involved in this case have been tried or convicted by the State of Oklahoma for the alleged attempted murder of Roberts. Nor has defendant Duardi been charged or convicted of any state or federal crime in regard to his Missouri sales tax returns.[3]

---

3. We do not reach the question of whether convictions on these charges after a constitutionally proper trial would be relevant to establish that a particular defendant was, in fact, "dangerous," within the meaning of §

3575(f). The fact, for example, that one may have been found guilty of some State or federal sales tax offense may or may not establish that he must be subject to a twenty-five year sentence in order to protect the

■ The government's notion that it may make and establish by a "preponderance of the information" new criminal charges in a Section 3575–3578 sentencing proceeding in order to justify further criminal punishment is untenable.

In Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), the Supreme Court dealt with the applicability of traditional constitutional safeguards to enhanced sentencing procedures. *Specht* involved application of the Sex Offenders Act of Colorado to a particular defendant for enhanced sentencing purposes. That Act provided that if the trial court "is of the opinion that any . . . person [convicted of specified sex offenses], if at large, constitutes a threat of bodily harm to members of the public, or is a habitual offender and mentally ill," the defendant could be given an indeterminate sentence of from one day to life.

*Specht* held that "invocation of the Sex Offenders Act means the making of a new charge leading to criminal punishment" and that the procedures were subject to "due process as measured by the requirements of the Fourteenth Amendment." Significantly, *Specht* quoted extensively from Gerchman v. Maroney, (3rd Cir. 1966) 355 F.2d 302, 312, which considered the enhanced sentencing procedures provided in Pennsylvania's similar Barr-Walker Act. That Act, like the Colorado statute involved in *Specht*, also contained a dangerousness definition which required a judicial factual determination that the defendant would, "if at large, constitute a threat of bodily harm to members' of the public, or is a habitual offender and mentally ill." The Supreme Court concluded that it agreed with and quoted with approval the following from the Third Circuit's opinion in Gerchman v. Maroney:

It is a separate criminal proceeding which may be invoked after conviction of one of the specified crimes. Petitioner therefore was entitled to a full judicial hearing before the magnified sentence was imposed. At such a hearing the requirements of due process cannot be satisfied by partial or niggardly procedural protections. A defendant in such a proceeding is entitled to the full panoply of the relevant protections which due process guarantees in state criminal proceedings. He must be afforded all those safeguards which are fundamental rights and essential to a fair trial, including the right to confront and cross-examine the witnesses against him." Gerchman v. Maroney, 355 F. 2d 302, 312. [386 U.S. at 609–610, 87 S.Ct. at 1212]

■ One of the most fundamental protections afforded by the Due Process Clause is the "reasonable-doubt standard . . . [which] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). Yet, the government contends that § 3575(b) authorizes a district judge to determine the guilt or innocence of a defendant on a new and independent criminal charge in nothing more than a sentencing hearing by a "preponderance of the information" which the government may adduce in evidence. Clearly, a finding based upon a "preponderance of the information" would not meet the due process requirement of "proof beyond a reasonable doubt."

The government's response states that, in order to prove the new and independent criminal charges stated in its proposed amended notice, it would ad-

public from further criminal conduct by the defendant within the meaning of § 3575(f).

Consideration of that and similar questions would bring into play constitutional imperatives applied in Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), and its progeny and our lack of ac-

curate information as to the effect of sentences generally. See Frankel: Criminal Sentences: Law Without Order (IIill and Wong New York, 1973). Compare The Second Circuit Sentencing Study (Federal Judicial Center, August, 1974).

duce, as "information," the testimony of F.B.I. or Narcotic Bureau agents as to what they heard from unnamed informers. The government would also seek to adduce government records made by dead agents reflecting similar information as long as 20 years ago. But, as Judge Freedman properly stated in *Gerchman, supra*, 355 F.2d at 310: "the failure to satisfy the requirements of due process [cannot] be justified by the general principle that a judge has the widest discretion in sentencing and for this purpose may receive unsworn and even unauthenticated information, unrestricted by the rules of evidence. Williams v. People of State of New York, 337 U.S. 241 [69 S.Ct. 1079, 93 L.Ed. 1337] (1940)."

Closely related to due process safeguards is the Sixth Amendment guarantee that every defendant has "the right to a speedy and public trial by an impartial jury . . . ." Moreover, Article III, § 2 of the Constitution has always provided that:

> The trial of all Crimes, except in cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed.

The government's amended notice would abridge this right since it seeks, in a proceeding where no jury trial is possible, a finding that defendants committed criminal acts for which criminal punishment should be imposed. See *Gerchman, supra,* at 313.

■ For the reason stated, we find and conclude, as a separate and independent alternate ground, that it would be constitutionally impermissible for this Court, sitting without a jury, to make a finding of "dangerousness," under § 3575(f) based upon "information" that defendants may, if charged and tried, be found guilty of the crimes alleged in the government's amended notice.

It is therefore apparent that the government's proposed amended notice does not state with the required particularity proper reasons which may be said to es-

tablish a factual base for either a government attorney's belief or for an ultimate judicial factual finding that any of the defendants may properly be considered to be dangerous special offenders, within the meaning of §§ 3575(e)(3) and 3575(f).

## VI.

■ If it is assumed that § 3575(f) could be read to permit a finding of "dangerousness" on the basis of new and separate criminal charges which could be established by a "preponderance of the information," without a jury trial, we are convinced that the statute can not pass constitutional muster. The legislative history of §§ 3575–3578 shows that at particular stages in the development of that complicated legislation some reliance was apparently placed upon the notion that what Mr. Justice Black said in the majority opinion in Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L. Ed. 1337 (1949), could be said to justify a "preponderance of information" standard and to ignore the obvious question of a defendant's right to jury trial. See U.S.Code Cong. & Admin.News, 91st Cong.2d Sess. ¶ 2 at p. 4074 (1970).

*Williams* related solely to the use of presentence reports in an ordinary sentencing situation. Mr. Justice Black stated that:

> In determining whether a defendant shall receive a one-year minimum or a twenty-year maximum sentence, we do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due-process clause would hinder if not preclude all courts—state and federal—from making progressive efforts to improve the administration of criminal justice. [337 U.S. at 251, 69 S.Ct. at 1085]

We are convinced, however, that this language must be read in the context of

the factual situation presented and that it may not be read to sustain the government's contention that the sentencing procedures provided in §§ 3575–3578 present questions similar to those considered in Williams v. New York.

Specht v. Patterson, *supra,* also frequently mentioned in the legislative history, made clear that the rule of *Williams* was not to be extended beyond its particular factual situation. In *Specht,* the Supreme Court expressly stated that "we decline the invitation to extend [Williams v. New York] to this radically different situation," under which the defendant was faced with an enhanced sentence under a dangerousness finding authorized by the Colorado Sex Offenders Act. 386 U.S. at 608, 87 S.Ct. at 1211. *Specht* explicitly held that due process safeguards must be observed when a "new charge leading to criminal punishment" is made in an enhanced sentence proceeding [id. at 610–611, 87 S.Ct. at 1212].

The Legislative Note entitled "Organized Crime Control Act of 1970," 4 Michigan Journal of Law Reform 546–650 (1971), contains a careful analysis of the entire Act. The particular analysis of title X, which constitutes §§ 3575–3578, is consistent with the view we have stated. In reaching the conclusion that all substantial due process rules are applicable to the enhanced sentencing provisions of §§ 3575–3578, the Note stated that "the findings made by the court under title X, and the resulting power to punish, differ substantially from the sentencing process involved in a typical recidivist statute." [Ibid. 633–634]. Conceding the constitutionality of habitual criminal statutes, the Note states that:

It is important to recognize that title X differs considerably from the typical recidivist statutes . . . which the trier of fact had only to establish the accused's identity, consider his past criminal record, and set punishment accordingly. A defendant may be classified a "special offender" if he is found to meet any one of three sets of criteria . . . Under each of the three special offender classifications, the judge must decide the additional question of whether the defendant is "dangerous," i. e., that confinement for longer than the penalty for the underlying felony is necessary to protect the public. The answers to these questions, decided without a jury and without full trial procedures, can be the basis of a sentence of up to twenty-five years. [Ibid. 634–635]

The Note, we believe properly, stated that "probably the most basic constitutional question involved in the sentencing provision of title X is whether the right to trial by jury can be denied a defendant simply by calling the judge's function 'sentencing'" [Ibid. p. 638]. Particular notice was taken of that provision of §§ 3575(b) and 3577 which "places no limitation on the type of 'information' the court may receive in assessing the defendant's special offender status." [Ibid. 638]. In regard to evidence questions, the Note, again we believe properly, stated that "the problem of admissibility of evidence should be put in the perspective of other due process safeguards afforded the defendant" [Ibid. 639].

The concluding paragraph of the Note's due process analysis stated the following conclusions:

Though Williams v. New York clearly allows a standard below reasonable doubt in the normal sentencing hearing, determinations by the judge under title X involve considerably more important issues than in the usual criminal case. Specht v. Patterson stands for the principle that a defendant must be afforded certain due process procedural rights in a particular kind of sentencing hearing in which there is a separate determination of fact which may lead to an increased term. Surely title X is more like the statute involved in Specht than the one in Williams—whether the defendant is dangerous and be-

longs to one of the three categories of special offender seem to be independent determinations of fact. If this is the case, the prosecution should be required to meet a reasonable doubt standard before the defendant can constitutionally be subjected to the increased penalties of title X. [Ibid. 642–643]

The government contends that the enhanced sentencing procedures provided in §§ 3575–3578 authorize it to make new criminal charges, which the government attorney wishes to include in his proposed amended notice, in order to support an ultimate judicial finding that each of the defendants charged are, in fact, "dangerous," within the meaning of § 3575(f). If, as the government contends, §§ 3575–3578 permit such a finding to be made as a part of a labeled enhanced sentence proceeding, we find and conclude that the statute is unconstitutional for the reasons we have heretofore stated. We therefore deny the government's motion for leave to amend on the separate grounds stated in this part of our opinion.

## VII.

 There is a final alternate and independent ground which requires that the defendants' motion to strike be granted and the government's motion for leave to file its proposed amended notice be denied. After careful consideration, we are convinced that the language of § 3575(f) purports to establish a standard so unduly vague and uncertain that it violates due process.

Section 3575(f) provides that a defendant is to be considered "dangerous" for the purpose of being subjected to increased sentence only "if a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant."

The legislative history of § 3575 shows that the Senate staff for the Judiciary Subcommittee on Criminal Laws and Procedures was concerned with past sentences imposed on individuals whom the Committee's staff considered to be "organized crime" figures. During the course of the development of the statute, however, it became apparent that all efforts to limit the enhanced sentencing procedures of §§ 3575–3578 to "organized crime" figures was impossible. The statute therefore ended up as a statute of general application to all persons convicted of any federal offense. The question presented by this change of apparent legislative purpose is whether the requisite condition of dangerousness, either standing alone, or as supplemented by the definition in § 3575(f) is sufficiently definite and explicit to comply with the requirements of due process.

Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), involved the validity of a statute passed by New Jersey in the 1930's which attempted to get crime off the streets by prohibiting particular individuals from being "gangsters," figures made familiar to younger people by the television re-runs of "The Untouchables." The 1934 New Jersey statute provided that "[a]ny person not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster . . ." Every convicted "gangster" was punishable by a $10,000 fine or a 20 year sentence, or both.

Mr. Justice Butler, for a unanimous court, concluded that the applicable due process rule was that stated in Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926):

That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary

886

notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. [306 U.S. at 453, 59 S.Ct. at 619]

The Supreme Court found that many and varied meanings were given the word "gang." It noted that the Court's attention had not been called to, nor had it been able to find "any other statute attempting to make it criminal to be a member of a 'gang.'" [Ibid. at 455, 59 S.Ct. at 620]. The Court expressly disapproved the New Jersey Court of Errors and Appeals' conclusion that the passage of a statute was a valid exercise of legislative power. The New Jersey court based its rejected conclusion on the following grounds:

> Public policy ordains that a combination designed to wage war upon society shall be dispersed and its members rendered incapable of harm. . . . The evident aim of this provision was to render penal the association of criminals for the pursuit of criminal enterprises; that is the gist of the legislative expression. . . . If society cannot impose such taint of illegality upon the confederation of convicted criminals, who have no lawful occupation, under circumstances denoting . . . the pursuit of criminal objectives, it is helpless against one of the most menacing forms of evil activity. . . . The primary function of government . . . is to render security to its subjects. And any mischief menacing that security demands a remedy commensurate with the evil. [Ibid. at 455–456, 59 S.Ct. at 620]

In rejecting the rationalization of the New Jersey court, the Supreme Court concluded that:

> The challenged provision condemns no act or omission; the terms it employs to indicate what it purports to denounce are so vague, indefinite and uncertain that it must be condemned as repugnant to the due process clause of the Fourteenth Amendment. [Ibid. at 458, 59 S.Ct. at 621]

Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966), considered a Pennsylvania statute which permitted juries to assess costs against an acquitted defendant should a jury find that the defendant's conduct, though not unlawful, was "reprehensible in some respect," "improper," outrageous to "morality and justice," or that his conduct was "not reprehensible enough for a criminal conviction but sufficiently reprehensible to deserve an equal distribution of costs," or that although acquitted, "his innocence may have been doubtful" [382 U.S. at 404, 86 S.Ct. at 521].

The Supreme Court, without dissent, concluded that "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it . . . leaves judges and juries free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case" "Certainly," Mr. Justice Black stated, "one of the basic purposes of the Due Process Clause has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land" [Ibid. at 403, 86 S.Ct. at 521].

We find and conclude, as a separate and alternate ground to support our ruling of both pending motions, that the language of § 3575(f) does not establish any legally fixed standard and that the language of that section is not sufficiently definite and explicit to avoid application of the recognized constitutional rule against vagueness.

VIII.

Accordingly, for the reasons stated, it is therefore

ORDERED (1) that the government's motion to dismiss its original Section

3575(a) notice against defendants Grayson and Husong should be and the same is hereby granted. It is further

ORDERED (2) that defendants' motion to strike the government's original Section 3575(a) notices should be and the same is hereby granted. It is further

ORDERED (3) that the government's motion for leave to file its proposed Section 3575(a) amended notice should be and the same is hereby denied. It is further

ORDERED (4) that this case be placed on the next convenient regular criminal docket of this Court for the purpose of imposition of final sentences in accordance with the provisions of § 4208(b), Title 18, United States Code.