UNITED STATES of America, Appellee,

v.

Richard G. WARME, a/k/a "Richard Warner," and James F. Heimerle, Defendants-Appellants.

Nos. 211, 212, Dockets 76–1576, 76–1577.

United States Court of Appeals, Second Circuit.

Argued Nov. 22, 1977.

Decided March 6, 1978.

Certiorari Denied May 1, 1978.

See 98 S.Ct. 1885.

---

Alan R. Naftalis, Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty. for the Southern District of New York, and Frederick T. Davis, Asst. U.S. Atty., New York City, on the brief), for appellee.

L. Jeffrey Weingard, New York City, for defendant-appellant Richard G. Warme.

Eleanor Jackson Piel, New York City, for defendant-appellant James F. Heimerle.

Before LUMBARD, WATERMAN and VAN GRAAFEILAND, Circuit Judges.

LUMBARD, Circuit Judge:

James Heimerle and Richard Warme appeal from their convictions in the Southern District, following trial before Judge Pollack and a jury, for conspiracy to possess, sell, pass, and deliver counterfeit United States federal reserve notes in violation of 18 U.S.C. § 473. On appeal Warme claims that the trial court erred in proceeding for a brief time in his absence, and Heimerle protests the severity of his sentence. In addition, they both argue that the trial court erred in admitting certain evidence against them and in allowing the government to withhold from them information concerning prosecution witnesses. We find these claims to be without merit, and accordingly we affirm the convictions and Heimerle's sentence.

The evidence showed that the conspiracy began in November 1975 when James Heimerle contacted a prison acquaintance, Joseph Peters, seeking the latter's help in selling some counterfeit $100 bills, which Heimerle apparently had received as a reward for "keeping his mouth shut on a previous crime." Peters then contacted Bernard Horwitz and persuaded him to aid in distributing Heimerle's counterfeit currency. Horwitz, after meeting with Heimerle, called Richard Warme, an acquaintance whom Horwitz believed to be in the market for counterfeit currency. Horwitz arranged a meeting with Heimerle, Peters, and Warme to discuss Warme's possible purchase of the counterfeit bills. This meeting, which occurred about a week after Heimerle's initial discussion with Peters, began at a diner in Yonkers, New York. After Heimerle agreed to sell Warme some counterfeit $100 bills for $1,500, they went to Dobbs Ferry, New York, where the transaction was consummated.

On December 10, 1975, Warme, Peters, and Horwitz went to a shopping center in Yomkers, where Warme gave Horwitz a counterfeit $100 bill and asked him to use it for a purchase at the Gimbels Department Store. While Warme and Peters waited

nearby, Horwitz proceeded with the plan and attempted to purchase a heating pad with the imitation $100 bill. An alert salesgirl noticed that the bill was counterfeit, however, and Horwitz was allowed to leave the store only after he professed innocence, surrendered the bill, and gave his name for transmittal to the Treasury Department.

Sometime later in December 1975, Warme, Peters, and Horwitz treated the counterfeit bills with heat and chemicals in order to improve their quality, and Warme then sent Horwitz to Las Vegas to make another attempt at passing the counterfeit currency. This project failed, however, when Horwitz' airline ticket and six sample counterfeit bills were stolen from his Las Vegas hotel room. Horwitz returned to New York and gave back to Warme the remaining counterfeit bills.

Around Christmas time of 1975, Heimerle, acting through Peters and Horwitz, once again approached Warme with an offer of counterfeit currency. These bills in denominations of $20, $50, and $100, were of considerably better quality than the batch Warme had purchased in November. Ultimately, Heimerle and Peters delivered $100,000 in the new counterfeit currency to Warme, and demanded payment of $12,000 in authentic currency. Warme agreed to this price, and persuaded Heimerle and Peters to return at a later time for payment in full.

In order to raise the $12,000 owed to Heimerle, Warme contacted Angelo Oliveri, Robert Oliveri (Angelo's son), and Lawrence Miressi and offered to sell part of the newly acquired counterfeit notes to them.[1] After hastily raising $2,700 for a down payment, the Oliveris and Miressi agreed to purchase $50,000 in counterfeit bills and to aid Warme in the distribution of the remaining $50,000. This agreement subsequently collapsed when Warme, under pressure from Heimerle to complete payment for the counterfeit currency, unsuccessfully sought Angelo Oliveri's aid in selling some of Warme's share of the $100,000. Upon

---

1. The record indicates that the Oliveris and Miressi were also involved in the earlier attempted distribution of Warme's first batch of counterfeit notes.

Oliveri's refusal to cooperate, Warme demanded, and obtained, the return of part of Oliveri's $50,000 share.

Warme was arrested by Secret Service agents on March 1, 1976. Heimerle had been arrested earlier, on February 6, 1976, in connection with another counterfeiting operation. On May 29, 1976, Heimerle, Warme, Horwitz, and Peters were indicted in four counts: the first count charged them under 18 U.S.C. § 371 with conspiracy to violate 18 U.S.C. § 473, and the second through fourth counts charged substantive offenses under 18 U.S.C. § 473. Prior to trial, Horwitz and Peters pled guilty to count one, and the remaining charges against them were dismissed; subsequently, they testified at Warme and Heimerle's trial. On October 1, 1976, following a five-day jury trial before Judge Pollack at which neither defendant took the stand, Heimerle and Warme were found guilty of conspiracy. As the jury disagreed on the other three counts, the court declared a mistrial as to those counts, which were subsequently dismissed on the government's motion. On November 15, 1976, Judge Pollack sentenced Heimerle to ten years in prison and a $10,000 fine. On November 16, 1976, Warme received a three year prison sentence.

■ Warme's claim that his conviction should be reversed because the trial proceeded without him for a brief period of time is without merit. Although he had been apprised that the second day of trial would commence at 10:00 a.m. on September 28, 1976, Warme failed to appear at the appointed time, having informed no one, including his attorney, of his whereabouts or the reason for his absence. After he had revoked Warme's bail and had delayed the trial twice—once at the request of the government—Judge Pollack, acting pursuant to Fed.R.Crim.P. 43, ordered trial to resume at 11:20 a.m. Between 11:20 and the noon recess a juror was questioned about possible prejudices not brought out

during the initial voir dire, Horwitz' direct examination was completed, and Heimerle's attorney began cross-examining Horwitz. Throughout this time Warme's attorney was present.

Warme finally appeared in court as the trial was about to resume at 2 p.m. after the lunch recess. His attorney advised the court that Warme had arrived at 1:20 p.m. and had been unable to come sooner. Counsel went on to explain that Warme's wife, who had recently given birth, had begun to hemorrhage that morning, requiring Warme both to rush her to the hospital and to care for their several small children. After further colloquy with Warme and his counsel, Judge Pollack said he would overlook Warme's infractions and thereupon reinstated bail, vacating the bench warrant issued earlier that day when Warme had failed to appear. The court made no finding regarding Warme's absence or his proffered excuses for failing to advise the court earlier of his whereabouts.

■ The trial then proceeded with counsel for Heimerle concluding his cross-examination of Horwitz. Following this, Warme's attorney cross-examined Horwitz at some length.[2] At no time did Warme or his counsel object to the trial's continuing in this fashion. Had either perceived that any prejudice would result from Warme's having been absent during part of Horwitz' testimony, they had only to say so and the trial court could have acted to remedy the situation, for example, by having the court reporter read back the testimony given in Warme's absence. No prejudice was alleged then, nor is the appellant able on appeal to indicate the slightest prejudice resulting from the procedure followed by the trial judge. In any event, having allowed the proper occasion for objection to pass without any complaint whatever, the defendant will not be heard now. See *United States v. Indiviglio*, 352 F.2d 276, 277 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663

---

2. The transcript of this cross-examination consumes sixty-five pages of the stenographer's minutes.

(1966). In view of our disposition of the defendant's claim, there is no need to inquire whether Warme's absence was excusable, a question on which the trial judge made no finding. Judge Pollack exercised sound discretion in proceeding with the trial without further delay.

■■■ Warme and Heimerle's objections to the admission of a redacted version of Warme's confession are also without substance. At a pretrial suppression hearing Judge Pollack found that Warme had voluntarily confessed to his participation in the counterfeit scheme and that Warme's rights had been meticulously protected by the Secret Service agents conducting his interrogation. This ruling is amply supported by the record.[3] Moreover, we find no prejudicial defects in the redaction of Warme's confession, done pursuant to *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which deleted all references to Heimerle's participation in the conspiracy.

■■■ We likewise find nothing objectionable in Judge Pollack's sentencing

Heimerle under the provisions of the Dangerous Special Offender Statute, 18 U.S.C. §§ 3575 to 3577. Under that statute, a defendant who is a "special offender," under one of the categories of § 3575(e), is subject to enhanced punishment for his offense if the sentencing judge determines that he is "dangerous" within the meaning of § 3575(f). In this case, the government filed notice with the court before trial, as required by § 3575(a), that it would request that Heimerle be sentenced as a dangerous special offender should he be convicted.[4] Following Heimerle's conviction, Judge Pollack held a hearing on the government's request, as required by § 3575(b), and after considering the presentence report and the evidence of Heimerle's five prior felony convictions, he ruled that Heimerle was a dangerous special offender. Accordingly, he sentenced Heimerle to ten years in prison for an offense that otherwise would have carried a maximum penalty of five years' imprisonment. We find no error in Judge Pollack's ruling.

If a defendant has been convicted of two separate felonies and actually incarcerated

---

**3.** Warme also challenges the admission of his confession under 18 U.S.C. § 3501 as having been obtained before arraignment but more than six hours after his arrest. This argument is frivolous, since he gave Secret Service agents his statement well within the six hours after his arrest by them. Although Warme had been at a New York City police station for some time prior to his federal arrest, the record shows that this time was not spent in "detention" and, in any event, cannot be considered for purposes of § 3501. See *United States v. Davis*, 459 F.2d 167, 170 (6th Cir. 1972). More important, § 3501 would not require the exclusion of Warme's confession even if it were obtained more than six hours after his arrest. Rather, § 3501 serves only to preclude courts from refusing to admit confessions obtained within six hours after arrest, if they are otherwise voluntary. See *United States v. Marrero*, 450 F.2d 373, 377–78 (2d Cir. 1971).

**4.** The original government notice asserted that Heimerle was a special offender under the provisions of both 3575(e)(1) and (2). The government chose not to pursue the latter alternative at the special hearing.

Appellant argued that the notice was insufficient because it failed separately to particularize the reasons why the government believed appellant to be dangerous and a special offender. *United States v. Duardi*, 529 F.2d 123 (8th Cir. 1975); *United States v. Kelly*, 384 F.Supp. 1394 (W.D.Mo.1974) aff'd., 519 F.2d 251 (8th Cir. 1975). *See also United States v. Sutton*, 415 F.Supp. 1323 (D.D.C.1976) (sister statute). The five-page notice prepared by the government lists each of the crimes for which appellant was convicted, and contains the general statement that the Assistant U.S. Attorney believes defendant dangerous. Under the view we have taken of this case, the notice was sufficient. The government was entitled to rely upon appellant's prior convictions to particularize both the reason that appellant was a special offender and the reason that he was dangerous, at least where that was the basis on which the government proceeded at the special hearing. Arguably, the U.S. Attorney could have given better notice of why appellant was dangerous by including the prognosis from the pre-sentence report. This, however, was impossible because the notice had to be filed before trial, and the pre-sentence report had not yet been prepared. On the facts of this case, the notice was adequate.

in the five years preceding his current felony conviction, he qualifies as a "special offender" under 18 U.S.C. § 3575(e)(1).[5] With five prior felony convictions to his credit, appellant is scarcely able to challenge Judge Pollack's determination that he was a special offender. Instead he focuses his attack on Judge Pollack's determination that he was "dangerous" within the meaning of § 3575(f). That section provides:

A defendant is dangerous . . . if a period of confinement longer than that provided for [the] felony is required for the protection of the public from further criminal conduct by the defendant.

In finding appellant dangerous, Judge Pollack relied on appellant's multiple convictions, and upon the conclusion of the presentence report that his prognosis for improvement was poor. We think that Judge Pollack was entitled to rely on these factors, and we agree they showed appellant to be dangerous.

 A defendant is not to be deemed "dangerous" simply because multiple convictions make him a "special offender" under § 3575(e)(1). However, in determining "dangerousness" a judge may properly consider all the evidence ordinarily relevant to sentencing a defendant. *See United States v. Neary*, 552 F.2d 1184 (7th Cir. 1977). The nature and frequency of defendant's previous encounters with the law are indisputably relevant to this determination. Similarly, the judge was entitled to rely on the pre-sentence report. *See* 18 U.S.C. §§ 3575(b), 3577. Appellant objects to this practice on the ground that it denied him his right of confrontation and cross-examination. However, despite the fact that § 3575(b) explicitly gave him the right to demand the attendance of the person who prepared the report, appellant failed to do so. His due process claim is therefore unpersuasive. On the basis of appellant's frequent encounters with the law and the poor prognosis in his pre-sentence report, Judge Pollack was entitled to rule that the "protection of the public" required Heimerle's confinement for a period "longer than provided for [the] felony." The statute does not require a finding that the defendant is dangerous in the sense of having propensity to cause physical harm to others. A defendant may be found dangerous simply because the evidence shows he has no regard for the law and the rights of the public.

We have considered appellants' other arguments on appeal, and find them to be without merit.[6]

Affirmed.

---

5. One of appellant's prior convictions has been set aside on procedural grounds since his sentencing. This does not mean that the district court erred in considering it in connection with his determination that appellant was "dangerous," *see United States v. Lee*, 540 F.2d 1205, 1210–12 (4th Cir. 1976), *cert. denied*, 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1978), and the remaining four convictions were more than sufficient to satisfy the requirements of § 3575(e)(1).

6. The most significant of appellants' other claims is Warme's assertion that the court erred in failing to order the government to turn over material under 18 U.S.C. § 3500. This material apparently included FBI agents' reports on an ongoing investigation of Joseph Corbo, an individual who had purchased counterfeit currency from the Oliveris. After an in camera inspection of the material, Judge Pollack ruled that it need not be given to Warme under § 3500. Such questions are generally committed to the discretion of the trial court, *see United States v. Augenblick*, 393 U.S. 348, 355, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969), and we find that Judge Pollack did not abuse his discretion here. Moreover, what Corbo may or may not have done was not relevant to any issue at trial.