UNITED STATES of America

v.

James INENDINO.

No. 78 CR 70.

United States District Court,
N. D. Illinois, E. D.

Sept. 21, 1978.

Robert D. Rose, Asst. U. S. Atty., Chicago, Ill., for the Government.

Julius Echeles, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

DECKER, District Judge.

On June 12, 1978, the defendant, James Inendino, was found guilty by a jury of violation of 18 U.S.C. § 371 and 18 U.S.C. § 2313. On June 13, 1978, the court was informed that a petition for dangerous special offender sentencing under 18 U.S.C. § 3575 had been filed by the government on May 19, 1978. Chief Judge Parsons ordered the petition suppressed until a judgment was entered.

The defendant filed various motions in response to the petition: motion to dismiss the petition; motion to strike certain portions of the petition; motion to transfer to the presiding judge for reassignment; and motion to strike and dismiss for improper disclosure of the petition. These motions were denied for the reasons stated at the time of ruling. However, inasmuch as the first two motions raised constitutional challenges to the dangerous special offender sentencing procedure, the court indicated that the objections were preserved and would be the subject of a later written opinion. This memorandum opinion and order fulfill that promise—the constitutional issues will be discussed in Part A.

In accordance with § 3575(b), a hearing was held on July 14 and 19, 1978. The defendant was present with counsel, and fully participated in the hearing through cross-examination and the opportunity to present witnesses or any other evidence. The defendant has moved to suppress evi-

dence presented at the hearing which was secured from wiretaps. This motion will be discussed in Part B herein. In Part C, the court will set forth the findings and reasons as required by § 3575(b).

### A. *Constitutional Objections.*

The defendant has raised numerous constitutional objections. First, he argues that § 3575 is constitutionally defective because it provides that the court is to make findings of fact based on a "preponderance of the information". Next, he contends that a finding of "dangerous special offender" may not be based on allegations of indictable criminal activity because this would violate his rights to grand jury indictment and to proof beyond a reasonable doubt. Third, he complains that the degree of discretion given to a prosecutor under § 3575 is unconstitutionally broad. Finally, the defendant urges that the definition of "dangerousness" under § 3575(f) is fatally overbroad and vague. These objections will be separately discussed.

### (1) *Findings of Fact by the Court on a Preponderance of the Information.*

Three courts of appeals have upheld § 3575 over objections based on the standard of proof and the lack of a jury trial, *United States v. Williamson,* 567 F.2d 610 (4th Cir. 1977); *United States v. Bowdach,* 561 F.2d 1160 (5th Cir. 1977); *United States v. Stewart,* 531 F.2d 326 (6th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376 (1976). As the Fifth Circuit held:

> "[I]t is argued that a defendant should be provided with the same due process protections afforded an accused in an ordinary criminal trial . . . While this view has some merit, we feel that the Due Process Clause does not mandate that *all* these procedural protections be present when a defendant is sentenced under the recidivist part of § 3575, and, consequently, the protections provided for in the statute are adequate." (Emphasis in original.) 561 F.2d at 1172.

These courts have found that the rights of the defendant are adequately protected by the safeguards provided in the statute, which include notice, counsel, compulsory process, and cross-examination. Moreover, the government must carry the burden of proof, and there is a broad review of the trial court's decision, *see United States v. Stewart, supra* at 331.

Nevertheless, the defendant argues that the Seventh Circuit has indicated that there may be serious constitutional problems with § 3575(b) and (e). In *United States v. Neary,* 552 F.2d 1184 (7th Cir. 1977), the court of appeals held that the determination of "dangerousness" on only a preponderance of the information and without a jury was constitutional, but suggested in dicta that the finding of "serious offender" may require proof beyond a reasonable doubt, 552 F.2d at 1192–93. The court of appeals suggested a possible ground for distinction:

> "We note a marked difference between the type of issue to be decided by a finding of special offender status under § 3575(e) and the type of issue decided by a finding of dangerousness under § 3575(f). The former involves historical facts, either prior convictions (under (e)(1) or the character and concomitants of the offensive conduct (under (e)(2) and (3)). The latter essentially involves both evaluation of the character of the defendant and a prediction of future conduct, matters which are traditionally left to wide discretion of a sentencing court. Because of this difference, we conclude that the essential function of a finding of special offender, under (e), is to expose the defendant to a sentence of imprisonment longer than the maximum prescribed by the statute under which he has been charged and convicted, but not exceeding twenty-five years, and that the essential functions of a finding of dangerousness, under (f), is to determine whether and to what extent a sentence in excess of the maximum for the particular offense is appropriate." 552 F.2d at 1193–94.

Later in the opinion, the court reiterated its concern:

"Although noting the existence of serious due process questions as to the determination under (e) by the procedure described in (b), we do not reach these questions because of defendant's concession as to the adequacy of the finding that he is a special offender." 552 F.2d at 1195.

In view of these observations, it is necessary to take a closer look at the constitutional questions surrounding § 3575(b) and (e). First, there can be no doubt that application of § 3575 may result in a deprivation of liberty within the meaning of the due process clause, *see Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (Stevens, J., concurring). Upon a determination that the defendant is a "dangerous special offender" within the meaning of subsections (e) and (f),[1] he is exposed to a longer maximum sentence than otherwise authorized, *see United States v. Neary, supra.* In the instant case, the two felonies of which Inendino was convicted carry maximum sentences of five years each; if he is found to be a dangerous special offender, he

---

**1.** The relevant portions of § 3575 are as follows:

"(b) . . . If it appears by a preponderance of the information, including information submitted during the trial of such felony and the sentencing hearing and so much of the presentence report as the court relies upon, that the defendant is a dangerous special offender, the court shall sentence the defendant to imprisonment for an appropriate term not to exceed twenty-five years and not disproportionate in severity to the maximum term otherwise authorized by law for such felony . . .

"(e) A defendant is a special offender for purposes of this section if—

(1) the defendant has previously been convicted . . . for two or more offenses committed on occasions different from one another and from such felony and punishable in such courts by death or imprisonment in excess of one year, for one or more of such convictions the defendant has been imprisoned prior to the commission of such felony, and less than five years have elapsed between the commission of such felony and either the defendant's release, on parole or otherwise, from imprisonment for one such conviction or his commission of the last such previous offense or another offense punishable by death or imprisonment in excess of one year . . .; or

(2) the defendant committed such felony as part of a pattern of conduct which was criminal under applicable laws of any jurisdiction, which constituted a substantial source of his income, and in which he manifested special skill or expertise; or

(3) such felony was, or the defendant committed such felony in furtherance of, a conspiracy with three or more other persons to engage in a pattern of conduct criminal under applicable laws of any jurisdiction, and the defendant did, or agreed that he would, initiate, organize, plan, finance, direct, manage, or supervise all or part of such conspiracy or conduct, or give or receive a bribe or use force as all or part of such conduct.

A conviction shown on direct or collateral review or at the hearing to be invalid or for which the defendant has been pardoned on the ground of innocence shall be disregarded for purposes of paragraph (1) of this subsection. In support of findings under paragraph (2) of this subsection, it may be shown that the defendant has had in his own name or under his control income or property not explained as derived from a source other than such conduct. For purposes of paragraph (2) of this subsection, a substantial source of income means a source of income which for any period of one year or more exceeds the minimum wage, determined on the basis of a forty-hour week and a fifty-week year, without reference to exceptions, under section 6(a)(1) of the Fair Labor Standards Act of 1938 . . ., and as hereafter amended, for an employee engaged in commerce or in the production of goods for commerce, and which for the same period exceeds fifty percent of the defendant's declared adjusted gross income under section 62 of the Internal Revenue Act of 1954 . . ., and as hereafter amended. For purposes of paragraph (2) of this subsection, special skill or expertise in criminal conduct includes unusual knowledge, judgment or ability, including manual dexterity, facilitating the initiation, organizing, planning, financing, direction, management, supervision, execution or concealment of criminal conduct, the enlistment of accomplices in such conduct, the escape from detection or apprehension for such conduct, or the disposition of the fruits or proceeds of such conduct. For purposes of paragraphs (2) and (3) of this subsection, criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

"(f) A defendant is dangerous for purposes of this section if a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant."

could receive up to twenty-five years for each offense. The statute does mandate that the term not be "disproportionate in severity to the maximum term otherwise authorized by law." One court of appeals has upheld a sentence of four times the normal maximum, *United States v. Williamson, supra; see also United States v. Warme,* 572 F.2d 57 (2d Cir. 1978) (two times normal maximum upheld).

However, the determination that due process applies does not, of course, complete the analysis of what procedural safeguards are required, *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Due process is a flexible concept which must be adjusted according to the situation involved.

Much of the debate over § 3575 has focused on the proper interpretation and application of the Supreme Court's decision in *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).[2] In that case, the Court considered a Colorado statute which provided that if a defendant is convicted of certain sex offenses, then the court may determine if he "constitutes a threat of bodily harm to members of the public, or is a habitual offender and mentally ill."[3] If the court made such a finding, then the defendant could be sentenced to an indeterminate term of from one day to life. The statute did not provide any procedural safeguards for the defendant. The court held that this proceeding violated the defendant's due process rights, and directed that:

> "Due process, in other words, requires that he be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own." 386 U.S. at 610, 87 S.Ct. at 122.

Some courts and commentators have interpreted *Specht* to mean that if a sentencing or other post-conviction proceeding involves new charges of criminal conduct, and results in increased imprisonment, then it must be conducted in accordance with the procedures of a normal criminal trial, *see, e. g. United States v. Duardi,* 384 F.Supp. 874 (W.D.Mo.1974), *affirmed on other grounds* 529 F.2d 123 (8th Cir. 1975). Dicta in the *Specht* case does support this view; for example, the Court points out that the statute requires a "new finding of fact" which results in "criminal punishment", and quotes from a lower court case holding that the defendant is entitled to "the full panoply" of criminal trial rights. Relying on this dicta, the court in *Duardi* concluded that the list of procedures set out in *Specht* (as quoted above) must be enlarged to encompass recent additions to the "full panoply" of trial rights, including the right to proof beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and trial by jury, *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

However, a closer examination of related Supreme Court cases leads to the conclusion that the Court has drawn a line between pre-conviction and post-conviction proceedings, and has approved post-conviction proceedings which provide less than the full panoply of trial rights. The widest discretion and informality is permitted in the normal sentencing procedure. In the leading case of *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), the Court held that a sentencing judge did not act improperly in imposing a death sentence on the basis of information received in a probation report, including information concerning the defendant's participation in

---

2. *Compare United States v. Duardi,* 384 F.Supp. 874 (W.D.Mo.1974), *affirmed on other grounds,* 529 F.2d 123 (8th Cir. 1975), *with United States v. Stewart,* 531 F.2d 326 (6th Cir.), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 376 (1976), and *United States v. Bowdach,* 561 F.2d 1160 (5th Cir. 1977). See also, 2 U.S.Code Cong. & Admin.News, pp. 4069, 4074 (1970).

3. It should be noted that the statute considered in *Specht* is distinguishable from § 3575 because the behavior described in § 3575(e) is much more closely tied to the underlying felony that was the triggering behavior in the *Specht* statute, *see United States v. Bowdach, supra,* fn. 6.

criminal activity for which he had not been convicted. The Court reasoned that ours is a system of individualized sentencing, and that this system requires that the judge be able to gather a broad range of information concerning the circumstances of the offense and the character of the defendant.

The *Williams* doctrine was recently reaffirmed in *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). In that decision, the Court considered a case in which the sentencing court frankly stated that he believed that the defense was a "complete fabrication" and that he considered this factor in the sentencing determination. The Supreme Court upheld this procedure over objection that it violated the defendant's right to formal adjudication on the charge of perjury. The Court reviewed the *Williams* case, and later decisions holding that the sentencing judge is not limited to information contained in the pre-sentence report, and indeed is unlimited as to the source of relevant information.[4] The Court found that even though there is a danger that consideration of other, unindicted, criminal activity may serve the purpose of saving the government the burden of further prosecution, this is still a permissible consideration under *Williams,* and is necessary to individualized sentencing.

Other cases have established one limit to the *Williams* doctrine. In *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), and *United States v. Tucker,* 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), the Court held that sentences were invalid if they were based on inaccurate information concerning the defendant's prior record. These cases have been interpreted to establish a due process right to rebut information presented to the judge and contested by the defendant, *see United States v. Harris,* 558 F.2d 366 (7th Cir. 1977).

The Supreme Court has required more formality in presentence proceedings which may result in sentences longer than the normal statutory maximum. In several early cases, the Court rejected due process and double jeopardy challenges to recidivist statutes, under which a defendant who had been previously convicted could receive an enhanced sentence. The Court held that recidivist sentencing was not a second punishment for the earlier crime, but rather increased punishment for the latest offense, due to aggravated circumstances:

> "[T]he repetition of criminal conduct aggravates their guilt and justifies heavier penalties when they are again convicted." *Graham v. West Virginia,* 224 U.S. 616, 623, 32 S.Ct. 583, 585, 56 L.Ed. 917 (1912).

Thus, this proceeding was not governed by the formal rules of criminal trial procedure.

However, in recognition of the fact that these procedures may result in a substantial deprivation of liberty, the Court has held that the defendant is entitled to representation of counsel, *Chandler v. Fretag,* 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954), and to notice and opportunity to be heard, *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). Although the exact dimensions of these rights have not been fully articulated, courts have held that they do not include the right to trial by jury, *see Turnbough v. Wyrick,* 551 F.2d 202 (8th Cir. 1977); *James v. Twomey,* 466 F.2d 718 (7th Cir. 1972),[5] nor the right to grand jury indictment, *United States v. Baca,* 451 F.2d 1112 (10th Cir. 1971); *see also, Beland v. United States,* 128 F.2d 795 (5th Cir.), *cert. denied,* 317 U.S. 676, 63 S.Ct. 157, 87 L.Ed. 543, *reh'g denied* 317 U.S. 710, 63 S.Ct. 205, 87 L.Ed. 566 (1942).

Given this background of other post-conviction proceedings, it is unlikely that the

---

4. The Court noted that Congress has codified this principle in 18 U.S.C. § 3577:

    "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 438 U.S. at 50, 98 S.Ct. at 2616.

5. The court in *James* posed the question whether a different result might be dictated by *Duncan v. Louisiana, supra* (due process requires jury trial in state criminal prosecutions) 466 F.2d at fn. 2. However, this possibility was implicitly rejected by the court in *Turnbough.*

*Specht* Court intended to hold that any factual finding which might result in increased imprisonment must be determined with the formality of a criminal trial. Such a holding would severely undermine the established *Williams* doctrine, which clearly anticipates that sentencing judges will make factual findings in an informal proceeding, and that these findings can be used to determine the length of imprisonment imposed, *see United States v. Bowdach, supra,* at 1174 fn. 6. Moreover, a careful reading of the *Specht* decision itself dictates this conclusion. Essential to the Court's reasoning is a comparison with the recidivist statute cases, 386 U.S. at 610, 87 S.Ct. 1209, and inherent in that reference is the conclusion that the post-conviction proceeding is different from a regular pre-conviction criminal trial.[6]

Thus, the dicta in *Specht* does not mandate a finding that § 3575 violates the due process clause by providing for findings of fact by the court on a preponderance of the information.

Similarly, this procedure is not unconstitutional merely because the court is called upon to make a determination of historical fact. The statute considered in *Specht,* and the recidivist statutes considered in *Chandler* and *Oyler* all required the courts to make determinations of historical fact. Yet, as we have seen, due process does not require proof beyond a reasonable doubt nor trial by jury in those proceedings. Moreover, the factual determinations required by § 3575(e) are very similar to those traditionally considered by a sentencing judge when he considers the seriousness and circumstances of the offense, *see Williams v. Oklahoma,* 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959); *United States v. Johnson,* 507 F.2d 826 (7th Cir. 1974), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975).

The courts which have upheld the validity of § 3575 have generally focused on the similarity between this statute and normal sentencing or recidivist sentencing, *see, e. g., United States v. Stewart, supra; United States v. Bowdach, supra.* As the court in *United States v. Holt,* 397 F.Supp. 1397 (N.D.Texas 1975),[7] observed:

"Defendants claim, and Judge Oliver has found, in *United States v. Duardi, supra,* that this proviso violates the constitutional due process requirement that a defendant in a criminal case can be convicted only if the prosecution proves guilt beyond a reasonable doubt. Once again, I must disagree with Judge Oliver's conclusion. *The enhancement statute comes into play only after a verdict of guilty.* The factors a judge considers in deciding whether to enhance a sentence under § 3575 are really little or no different from those he considers in pronouncing sentence in any other case—they include the defendant's past criminal record, the probation officer's evaluation and recommendation, the seriousness of the instant offense, the offender's attitude, and others." 397 F.Supp. at 1400 (emphasis added).

The conclusion that a post-conviction finding such as that required by § 3575(b) and (e) may be based on a standard of proof less than beyond a reasonable doubt is supported by the Supreme Court's recent interpretation of *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). In *Mullaney v. Wilbur,* the Supreme Court invalidated a Maine common law rule that the defendant must carry the burden of proving provocation sufficient to reduce the crime from murder to manslaughter. The Court held that this rule violated the defendant's right to proof beyond a reasonable doubt on the element of malice aforethought. Many commentators interpreted this case to mean that proof beyond a reasonable doubt was the requisite standard for any finding which affected the degree of punishment. However, the Court has expressly repudiated this view; in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct.

---

**6.** The Seventh Circuit has characterized the procedure involved in *Specht* as a "special sentencing proceeding." *Rud v. Dahl,* 578 F.2d 674, 678 (7th Cir. 1978).

**7.** *Modified on other grounds* as *United States v. Bailey,* 537 F.2d 845 (5th Cir. 1976).

2319, 53 L.Ed.2d 281 (1977), the Court upheld a New York law requiring the defendant to prove, by a preponderance of the evidence, the affirmative defense of "extreme emotional disturbance":

> "*Mullaney's* holding, it is argued, is that the State may not permit the blameworthiness of an act or the severity of punishment authorized for its commission to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt. In our view, the *Mullaney* holding should not be so broadly read." 432 U.S. at 214–15, 97 S.Ct. at 2329.

In view of the fact that the Supreme Court has relaxed the requirement of proof beyond a reasonable doubt in pre-conviction cases, it seems likely that it is permissible to do so in post-conviction proceedings, cf. *United States v. Smith,* 571 F.2d 370 (7th Cir. 1978) (standard of proof in probation revocation proceeding is to court's "reasonable satisfaction").

■ The approach and reasoning employed by those courts which have upheld the constitutionality of § 3575 is consistent with the relevant Supreme Court cases, and this court will follow them. Section 3575 is a post-conviction proceeding aimed towards a special sentencing evaluation of certain enumerated factors which Congress has determined to be especially aggravating circumstances. The triggering determinations set out in subsection (e) are specifically tied to the underlying conviction, and are of a type traditionally relevant to the seriousness of the offense. The statute provides substantial procedural safeguards for the defendant, including notice, counsel, compulsory process and cross-examination. The government must carry the burden of proof, and there is broad review of the trial court's decision. This is sufficient to satisfy the requirements of due process.

(2) *Allegations of Indictable Criminal Activity.*

■ The defendant argues that a finding of "dangerous special offender" may not be based on allegations of indictable criminal activity because this would violate a right to grand jury indictment and to proof beyond a reasonable doubt. However, this claim has been squarely rejected by the Supreme Court in sentencing cases, see, e. g., *United States v. Grayson, supra,* and by courts considering § 3575, see, e. g., *United States v. Ilacqua,* 562 F.2d 399, 404 (6th Cir. 1977).

■ Implicit in the preceding discussion is the conclusion that § 3575 is not a criminal proceeding within the scope of the grand jury clause. Similarly, the requirement of proof beyond a reasonable doubt for conviction is not impaired by the procedure established in § 3575.

(3) *The Degree of Discretion Given the Prosecutor.*

■ The defendant argues that § 3575 gives the prosecutor "unbridled discretion" whether or not to proceed against any particular defendant to whom the statute might apply and thus violates the due process clause. However, this contention was specifically rejected by the Seventh Circuit in *United States v. Neary, supra,* at 1194–95, see also, *Oyler v. Boles, supra,* 368 U.S. at 456, 82 S.Ct. 501. As the Seventh Circuit held:

> "Without a claim by the defendant that prosecutorial selectivity has been based on an unjustifiable standard such as race, religion or other arbitrary classification, there is no basis for finding denial of equal protection." 552 F.2d at 1195.

(4) *The Definition of Dangerousness.*

■ The defendant's final constitutional objection is that the definition of dangerousness under § 3575(f) is fatally overbroad and vague. This argument, too, has been consistently rejected by courts of appeals, including the Seventh Circuit, *United States v. Neary, supra,* at 1194; see also, *United States v. Bowdach, supra,* at 1175

B. *Motion to Suppress Evidence Secured from Wiretaps.*

By this motion, the defendant seeks to suppress wiretap evidence which was

presented at the dangerous special offender hearing. The motion asserts three objections to this evidence:[8] first, it is argued that the affidavits underlying the application for wiretap orders are insufficient; next, the defendant contends that there was a failure to obtain proper authorization from the Attorney General; third, it is urged that this court declare the wiretap provisions, 18 U.S.C. §§ 2510 et seq., unconstitutional.

■ The wiretap evidence presented at the dangerous special offender hearing was secured pursuant to orders by Chief Judge Parsons, in the matter numbered 77 C 4706. The government has submitted copies of the affidavits underlying the applications for those orders to the court, and also to the defendant. These affidavits set forth, in great detail, the reasons for the wiretap application, and provide a sufficient basis for Chief Judge Parsons' orders.

■ Attached to the first wiretap order application is an order by Attorney General Griffin Bell designating the Assistant Attorney General in charge of the Criminal Division to authorize applications for wiretap orders. Also attached is a memorandum from the Assistant Attorney General in charge of the Criminal Division, Benjamin Civiletti, authorizing the application here involved. Finally, there is a letter from M. R. Loewey, a Deputy Chief of the Organized Crime and Racketeering Section, to Mr. Peter Vaira, the attorney in charge of the Chicago Strike Force, informing him of Mr. Civiletti's authorization. These documents clearly demonstrate that there was proper authorization for the wiretap application, as required by 18 U.S.C. §§ 2510 et seq.

■ The defendant's final objection, that the wiretap provisions are unconstitutional, is not seriously argued. The defendant concedes that the Supreme Court has not found the law unconstitutional, and he does not cite any court or commentator who

has embraced that position. It is sufficient merely to observe that numerous courts have upheld the constitutionality of these provisions, see, e. g., United States v. Falcone, 505 F.2d 478 (3d Cir. 1974), cert. denied, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975).

Accordingly, the defendant's motion to suppress the wiretap evidence is hereby denied.

## C. Findings and Reasons for the Sentence Imposed.

This section will set forth the court's findings and reasons as required by § 3575(b).

### (1) "Special Offender".

Section 3575(e)(1) provides that a defendant is a special offender if he has previously been convicted of two or more felonies for offenses different from one another and from the instant conviction, if he was imprisoned prior to the instant offense, and if less than five years have elapsed since his release from custody and the commission of the instant offense.

The defendant, James Inendino, was convicted in the Northern District of Illinois before Judge Napoli in February, 1971. His conviction involved the theft of two trailerloads of copper rod and conspiracy to do so, in violation of 18 U.S.C. §§ 659 and 371. The offenses were committed during April and May, 1969. The defendant was sentenced to four years imprisonment for each offense, to be served concurrently. (The court relies upon: certified copies of the indictment and judgment order in cause number 70 CR 295; defendant's acknowledgement of this conviction, in court and in post-hearing objections to proposed findings of fact.) A recent challenge to this conviction, brought under 28 U.S.C. § 2255, was dismissed by Judge McGarr. (The court relies upon: the public court record in 70 CR 295).

---

8. The motion also suggests that the defendant may want to assert two other objections—that the Special Attorney did not file reports called for by the wiretap orders, and that the total number of calls intercepted was excessive. However, the government has responded that reports were filed, and that 1300 telephone conversations were intercepted.

The defendant was convicted before this court in March, 1971. This conviction involved the unlawful possession of a trailer-load of stolen electronic equipment and a conspiracy to do so, in violation of 18 U.S.C. §§ 659 and 371. The offenses were committed during July, 1969. The defendant was sentenced to five years imprisonment, four years of which were to be served concurrently with the sentence imposed in 70 CR 295, and one year to be served consecutively. (The court relies upon: certified copies of the indictment and judgment order in cause number 70 CR 572; the defendant's acknowledgment in court and in his post-hearing objections to proposed findings of fact.) This conviction, too, was the subject of a motion under 28 U.S.C. § 2255; this motion was denied by memorandum opinion and order dated June 9, 1978.

The defendant contends that the two convictions described above are invalid because they were based on guilty pleas which were not taken in conformance of the law. Both this court and Judge McGarr have recently considered and rejected these challenges as raised in motions under 28 U.S.C. § 2255. Accordingly, the court finds that these convictions are valid.

Finally, the defendant was convicted in the Northern District of Illinois before Judge Grady on March 7, 1978. His conviction involved a conspiracy to defraud the John Hancock Mutual Life Insurance Company of Boston, and the interstate transportation of forged securities, in violation of 18 U.S.C. §§ 2314 and 371. The offenses were committed during August and September, 1974. The defendant was sentenced to five years imprisonment on each of eleven counts, to be served concurrently. The defendant is presently serving that sentence. The defendant has appealed the conviction. (The court relies upon: presentence report dated July 14, 1978; the defendant's acknowledgment in court and in the post-hearing objections to proposed findings of fact.)

The defendant was imprisoned on the sentences imposed by Judge Napoli and by this court, and was released on parole on February 5, 1973. The offenses for which he now stands convicted were committed during 1974, while the defendant was on parole, and within five years of his release. (The court relies upon: the presentence report.)

 Accordingly, the court finds that the defendant is a special offender within the meaning of § 3575(e)(1).

(2) *"Dangerous"*.

At the dangerous special offender hearing, and through the presentence report and the evidence at trial, the court has been given a wide range of information which allegedly bears on the defendant's "dangerousness". The court's findings on this matter are guided by the statutory definition:

"(f) A defendant is dangerous for purposes of this section if a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant."

The Seventh Circuit has observed:

"The factors considered in determining dangerousness are not different from factors normally considered by a judge in the sentencing process. . . .

.      .      .      .      .

"Likelihood of future criminality and the potential danger to society are determinations implicit in sentencing decisions." *United States v. Neary*, 552 F.2d 1184, 1194 (7th Cir. 1977).

 The picture which emerges from this information is of a violent man deeply involved in crime, unrepentant, and very likely to engage in further criminal conduct. The following discussion will first set forth a summary of the testimony and evidence presented at the dangerous special offender hearing. Next, the particular information relied upon by the court in making the "dangerousness" determination and the reasons for that determination will be specified.

Louis Almeida is presently in the Federal Witness Protection Program. On March 8, 1978, he was released on parole after serv-

ing a sentence imposed by the United States District Court in Toledo, Ohio, after he was convicted of firearms violations. Almeida has served as the government's witness in a number of criminal trials, and his sentence was reduced in recognition of this cooperation. Almeida was the government's principal witness at the dangerous special offender hearing in this case. Almeida's testimony revealed that he was deeply involved in serious criminal activity; indeed, he testified that when he was arrested, he was on his way to kill a man in Pittsburgh in exchange for his share of a $10,000.00 fee.

Almeida testified that in July of 1973, he and the defendant, together with Harry Aleman, Sammy Inendino and a black man called Williams participated in the theft of two trailerloads of miscellaneous tobacco products from the C & O and B & O railroad yards in Chicago. Almeida testified that the defendant and the others took the trailers from the yard, but then returned them after they saw that the trailers did not contain cigarettes.

Almeida further testified that in early 1974, Harry Aleman asked him to watch the daily activities of a man named Robert Harder, part owner of a pornographic bookstore. Almeida testified that he watched Harder for several weeks, periodically informing Aleman of his findings, and then participated in an attempt to murder Harder, in which the defendant, Inendino, also took part. Almeida testified that he and Harry Aleman drove in a car, carrying a shotgun and a handgun, to a snack shop where they met the defendant and a man called "Tyrone"; that the defendant drove a second car (the "work car", meaning a car which is stolen but has been equipped with "clean" plates and registration); that they went to a restaurant where Almeida had often observed Harder, and where the four planned to kill Harder. Almeida testified that the plan was for the others to go in the back door of the restaurant when Almeida signaled Harder's presence, to line up the customers along one wall, and then to shoot Harder. Almeida testified that the plan was frustrated because Harder was not at the restaurant, and as the four waited, several police cars arrived at the restaurant. Almeida testified that his association with Aleman ended after this incident. Almeida testified that although he did make a phone call from the restaurant while the others were waiting, he did not call the police.

Almeida testified to one other incident involving the defendant and Harry Aleman. He testified that during or after January of 1974, he was present with the defendant, Harry Aleman and another man in Harry Aleman's home for the purpose of planning the theft of three trailerloads of television sets. When Almeida arrived, the others were apparently discussing the possibility that someone was giving information to the police incriminating various members of the group. Almeida testified that when he entered the kitchen, Aleman suggested that possibly he, Almeida, was giving the information to the police. Almeida testified that the defendant then said "could it be coming from that nigger Williams?"

The government produced two F.B.I. agents to collaborate parts of Almeida's testimony. Agent O'Rourke testified that, according to the police investigative reports, Harder's body was found on September 28, 1974, near a car next to a bean field in Dwight, Illinois. Harder had apparently been shot with a revolver, Agent O'Rourke testified, but no murderer has ever been identified. On cross-examination, O'Rourke conceded that Cylus Fletcher was one of several suspects in the Harder murder, but he also testified that Fletcher was in jail at the time of the murder.

Agent O'Rourke also testified that he interviewed Almeida in December of 1976, and that at that time Almeida identified a picture of Orion Williams as the black man named "Williams" who had participated in the abortive theft of two trailerloads of miscellaneous tobacco products in July of 1973.

Agent Keizer testified that he was involved in the investigation of a theft of two trailerloads of tobacco products from the C & O and B & O railroad yards in July of

1973. He testified that although the trailers were returned with their full loads, the theft was discovered because the seals on the trailers had been changed, even though the trailers were duly recorded as going out and coming back in the normal yard logbook.

Agent Keizer further testified that he arrested Orion Williams in June, 1974, for possession of a stolen trailerload of meat. Keizer testified that about two weeks later, he met with Williams to tell him that a confidential source had overhead a conversation in which someone said, "O. has to be taken care of." Keizer further testified that in July of 1974, Orion Williams' body was found in the trunk of an automobile at 33rd and State Street. Keizer testified that further investigation revealed that Williams had been shot, and that he had been dead for about two weeks when he was found.

The government also offered tape recordings and transcripts thereof as duly authenticated reproductions of eight tape-recorded telephone conversations and one tape-recorded oral conversation which were obtained pursuant to the orders entered by Chief Judge Parsons. These orders authorized the interceptions conducted during March, April and May of 1978. The oral conversation and five of the telephone conversations were played in open court; three of the telephone conversations were played to the court in chambers, in the presence of both sides. In summary, the contents of these conversations were as follows:

(1) March 10, 1978, approximately 7:54 P.M.—The defendant received a telephone call from "Paul" during which he told "Paul" to tell "Howard" that if didn't pay up on four weeks of overdue $60.00 payments, "I will grab him . . . I'm going to break his fucking head."

(2) March 13, 1978, approximately 5:07 P.M.—The defendant received a telephone call from "Chuck" during which the defendant told "Chuck" that if he didn't make a $200.00 payment by 6 o'clock the following day, "I'll break every fucking bone in your body before I go to jail. Every fucking

bone in your body." (This was only three days after the defendant was convicted in the case before Judge Grady.) The defendant told "Chuck" that he was to continue making payments every Friday thereafter.

(3) April 21, 1978, approximately 7:25 P.M.—The defendant received a phone call from "Bob" during which he instructed "Bob" to collect $250.00 from another individual each Saturday, because the other man was six weeks behind in his payments. The defendant stated that if the man did not pay, "He'll never ride a fucking horse again, the rest of his life."

(4) May 12, 1978, approximately 7:13—The defendant received a phone call from "Bobby" during which the defendant explained that he planned to make pick-ups of payments that evening from "Chuckie", "Joey", and "Bobby". "Bobby" agreed to meet the defendant at his house the next day with his own "$120.00" and with "Frankie's $750.00."

(5) April 21, 1978, during a conversation, lasting several hours during the evening, with "Nick" on the premises of the Lady Cash Messenger Service, the defendant stated that "All my life, all my life, since I was old enough to steal and rob and kill, and do everything. What I got, clothing, money, cars, home, keeping her up, I got. Nobody ever give it to me." In the same conversation, the defendant told "Nick" that he would like to see "Nick" "have all of Waukegan. All of Waukegan . . . The booking, juice, all, everything illegal out there." In addition, the defendant stated that he would give $500,000.00 if someone could arrange for him to "stay on the street".

(6) On three separate occasions during April, 1978, the defendant and "Nick" engaged in conversations during which they expressed their intentions and hopes to bring improper pressure to bear on a federal judge in order to influence two criminal matters then pending against the defendant. This objective was to be accomplished unlawfully, with "Nick" acting as the defendant's agent.

The only witness called by the defense was Agent Keizer who testified that although the theft of television sets in January of 1974 was never solved, two men, including Eugene Phebus, were indicted for possession of some of the stolen televisions in Indiana.

In finding that the defendant is dangerous within the meaning of § 3575(f), the court relies upon the fact that he has been convicted four times within the last eight years, three times for offenses related to theft from interstate commerce and once for offenses related to fraud and forged securities. Prior convictions may be considered in the determination of dangerousness, *United States v. Warme,* 572 F.2d 57, 62 (2d Cir. 1978). The court also relies upon the presentence report which indicates that the defendant continues to insist that he is simply being harassed by federal agents, and gives no suggestion that the defendant is in any way repentant of his crimes. In addition, the evidence produced at the trial indicates that the defendant participated in and partially directed a scheme whereby trailers and a tractor were stolen, disguised, and eventually used in the defendant's own business, T & J Trucking, Inc.

Moreover, the court does find reliable the government's evidence concerning the defendant's involvement in the collection of loans by extortionate means. The tape-recorded telephone conversations reveal that even within three days of his conviction before Judge Grady, the defendant was engaged in this extortion. This behavior demonstrates that the defendant has not been deterred from criminal activity, and indeed is likely to engage in further criminal conduct injurious to society.

Similarly, the court finds reliable the other tape-recorded interceptions. These further demonstrate that the defendant is deeply involved in criminal conduct, and that even the pendency of criminal prosecutions has not caused him to cease this activity.

The court also finds reliable Almeida's testimony that the defendant took part in an abortive theft of two trailerloads of to-bacco products in July of 1973 and in an attempt to murder Robert Harder in early 1974. However, the court does not make any finding that Inendino took part in the actual murder of Harder or of Orion Williams. The evidence on these matters is highly tenuous, and does not establish a preponderance of the information.

The information specified as reliable in the preceding discussion does provide a preponderance of the information in support of the conclusion that the defendant is dangerous within the meaning of § 3575(f).

Accordingly, the court has determined that the defendant is a dangerous special offender. A period of confinement longer than that otherwise provided for the felonies of which he stands convicted is required for the protection of the public from further criminal conduct by the defendant. Furthermore, the court finds that there is little likelihood of speedy rehabilitation of this defendant.