**UNITED STATES of America, Plaintiff,**

v.

**Chinyelu Nantambu HONDO, a/k/a Wade Alexander Russell, Defendant.**

**Crim. No. 4–83–31.**

United States District Court, D. Minnesota, Fourth Division.

Nov. 22, 1983.

Thomas Heffelfinger, Asst. U.S. Atty., Minneapolis, Minn., for plaintiff.

Scott Tilsen and Carolyn P. Short, Asst. Federal Public Defenders, and Daniel Scott, Federal Public Defender, Minneapolis, Minn., for defendant.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Defendant Chinyelu Nantambu Hondo, a/k/a Wade Alexander Russell (Hondo) was charged in the superseding indictment herein with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 1202(a)(1) (Count I) and with receiving a firearm as a convicted felon in violation of 18 U.S.C. § 922(h)(1) (Count II). He first appeared before this court on May 2, 1983 at which time he entered a plea of guilty to receiving a .22 caliber revolver on or about March 13, 1983 in violation of Count II. By agreement with the government Count I is to be dismissed at sentencing. A presentence investigation was ordered. The report was completed and furnished to the court on June 20, 1983.

At the time of defendant's plea it was first brought to this court's attention that the government had filed a notice of dangerous special offender status, pursuant to 18 U.S.C. § 3575, by which it seeks to increase Mr. Hondo's sentence for the instant conviction. All intervening proceedings herein have been in connection with § 3575.

This court's Order of Appointment of Expert dated May 26, 1983, set forth much of the background to that point and appointed Dr. Carl Malmquist, a psychiatrist, as an expert witness. Dr. Malmquist was to evaluate the defendant and submit a written report to the court and the parties. Subsequently counsel gathered documents to submit to the doctor prior to his interview with Mr. Hondo. Dr. Malmquist's report of his psychiatric evaluation of the defendant, dated July 16, 1983, was submitted to the court, and copies were forwarded to counsel for their study and review.

On August 2, 1983 the court issued notice, pursuant to 18 U.S.C. § 3575(b), to the parties and counsel that the hearing re-

quired under the statute would commence at 9:00 a.m. on August 12, 1983. Opportunity had already been presented for inspection of the complete presentence report, and the court asked counsel to give notice of any part intended to be controverted. Since Dr. Malmquist was temporarily out of the country and would not return until later in August, it was agreed that the hearing would not be completed on August 12, 1983. Both counsel would have the opportunity to confer with Dr. Malmquist after his return, and either party might then call him as a witness.

At the hearing on August 12, 1983 the government introduced a number of documentary exhibits. They included certified copies of defendant's judgments of convictions for burglary on August 9, 1967, for aggravated assault on February 15, 1973, and second degree murder on March 2, 1973. The record indicates that defendant was sentenced to probation on the burglary conviction, to 3–10 years in the Minnesota state prison for the aggravated assault, and to 3–25 years for the murder conviction, to be served concurrently with the sentence for assault. Other exhibits reflect his change of name from Russell to Hondo in 1974, his records from the Minnesota Department of Corrections, and that the murder occurred while the defendant was released on bail on the aggravated assault charge then pending. A transcript from the proceedings in which defendant pleaded guilty to the lesser included offense of murder in the second degree, police reports from 1972 relative to the assault and murder charges, and the deposition of a witness to the murder were also received.

Related to his parole record were a parole violation report dated July 19, 1982 and a statement of rules, regulations, and conditions of parole signed by defendant on February 8, 1983. These exhibits show that he was first released on parole on June 15, 1982 "to successfully complete the 180 Degrees Program." He was terminated from the halfway house on July 16, 1982 after urine tests indicated marijuana use. He was returned to prison but released again on parole on February 8, 1983, with special conditions that he satisfactorily complete the 180 Degree Halfway House, completely abstain from mood altering chemicals, and cooperate with a urine screen on demand. One of the listed rules and conditions of parole gives notice that possession of firearms is illegal and that the parolee may not "purchase or otherwise obtain or have in possession any type of firearm."

The government also called two witnesses: Gary Lundeen, a parole officer associated with defendant's parole officer, and Kenneth Olson, a Minneapolis police officer who arrested defendant on March 16, 1983. Lundeen testified that the defendant left the 180 Degree Halfway House on February 21, 1983, after refusing to submit to a urine test. On the next day application for an arrest warrant was made. Officer Olson testified that the defendant first came to his attention on the morning of March 16 while he was monitoring traffic in a marked squad car at a busy intersection in Minneapolis. He attempted to stop defendant's rented car after it made a forbidden left hand turn. Olson pulled behind defendant's car and activated the squad's roof-top red lights. The car continued on, however, and after it went through a red semaphore, he activated his siren. The car then accelerated and reached speeds up to 60 miles per hour before finally hitting a parked car. This chase took place during the latter part of the morning rush hour when there was a substantial amount of traffic.

After the impact, the defendant left the car and ran away carrying a plastic bag. Officer Olson pursued him on foot through yards and into an alley where he was arrested. The defendant initially gave his name as Kenneth Wormsley and submitted identification in that name. Olson found ammunition for a .22 caliber revolver in the car by the driver seat and in the snow beside the open door. The plastic bag carried by defendant contained a ski mask, surgical gloves, a brown wallet containing a driver's license and other personal items belonging to defendant Hondo, a package of balloons, and some photographs of defendant and others. All of these items

were among the exhibits introduced at trial. The plastic bag was torn in the bottom, and the unloaded .22 revolver apparently fell through the tear. It was dropped in the snow by defendant just before he was apprehended.

The defendant called no witnesses at the hearing, but he introduced some exhibits: a letter from Mrs. Cathleen Russell asking the court to consider the impact of any sentence on her and their two children, ages 11 and 10; a copy of a police report on an interview with defendant on March 17, 1983, in which he denied committing any recent robbery and stated that the bag with the gun was given to him by a friend but that he was unwilling to identify the friend or a girlfriend he was on the way to visit; and "Defendant's Expanded Presentence Report Statement" which seeks to correct errors in the report in respect to the age of his brother Wayne, his marital history, and the cause of a back injury from an accident. The statement also provides more details about his work history. From 1966 to 1972, with some interruptions, he worked at the Way Community Center. He was also associated with the People's Church and various other programs. While in prison he worked as a clerk and a painter, as well as an inmate counselor. The court accepts defendants' statements expanding upon the presentence report as true.

Two exhibits were introduced as court exhibits: the presentence report and the report and evaluation of Dr. Malmquist. The hearing was then recessed until the doctor's return.

On September 15, 1983, Dr. Malmquist appeared to testify. Although counsel had arranged the time and date with the doctor and the court, Scott Tilsen, defendant's preferred attorney, did not appear due to another proceeding. Daniel Scott, Mr. Tilsen's supervisor, appeared with defendant and moved for a continuance. Since Mr. Scott was familiar with the case and the doctor's report, and due to the difficulty of rescheduling the witness, the court declined to continue Dr. Malmquist's testimony. The court agreed, however, to a continuance for the purpose of final arguments to a date when Mr. Tilsen would be available and after he would have the opportunity to review the transcript of the doctor's testimony.

Dr. Malmquist testified that in his opinion Mr. Hondo has psychological and psychiatric problems in the nature of a character problem but that he is not psychotic. The doctor found the defendant to have an I.Q. of 115 and to be grossly undertrained. He sees him as bright and articulate "but still fighting a lot of oppositional battles against authority which have continued to get him into trouble." The defendant has a propensity to act out his anger and sense of injustice by antisocial behavior. In Dr. Malmquist's considerable experience, individuals with these characteristics tend to "burn out" around the age of 40, although it may take longer.[1] Although the defendant has the capacity to grow in understanding his reactions and behavior patterns,[2] he is not yet at the point where he can control his impulses.

Final arguments were then held on September 30, 1983. At the very end of this proceeding, Mr. Tilsen asked whether defendant would have his right of allocution. The court responded that he would have an opportunity to address the court prior to imposition of sentence, and nothing further was said by counsel. After further consideration, the court decided to give defendant an opportunity to be heard by way of allocution prior to determination of his status. It could be argued that the right of allocution would be of little meaning in a proceeding under § 3575 if it were deferred. The statute provides that if the court finds

---

1. The doctor defined what he meant by "burn out" in his written evaluation of the defendant. He indicated that at about that age, the "likelihood of future violence" is lessened, as are "the amount of aggression and energy" used to carry out challenges to authority and antisocial behavior.

2. Dr. Malmquist's testimony is consistent in this respect with a report dated December 19, 1980 from a Department of Corrections staff psychologist noting areas of improvement in the defendant's attitude.

defendant a dangerous special offender, it shall enhance the sentence. 18 U.S.C. § 3575(b). Neither counsel raised any objection.

Accordingly, on October 6, 1983, Mr. Hondo had the opportunity to address the court directly on his background, goals, and future plans.

There is really only one issue before the court, and that is whether Mr. Hondo is "dangerous" within the meaning of 18 U.S.C. § 3575(f). He has not challenged the statute itself, and the Eighth Circuit has recently upheld its constitutionality. *United States v. Cox,* 719 F.2d 285 (8th Cir.1983). No real dispute has been raised over whether he is a "special offender" within the meaning of § 3575(e)(1).[3]

■ Defendant has previously been convicted in Minnesota courts of burglary, aggravated assault, and murder in the second degree. These offenses were all punishable by imprisonment in excess of one year and were all committed on occasions different from one another and from the offense to which he has entered a plea of guilty in this court. Less than two months after his release on parole from imprisonment for his aggravated assault and murder convictions, he committed the offense to which he has pled guilty. The court finds that he is a special offender for purposes of § 3575.

Section 3575(f) provides:

A defendant is dangerous for purposes of this section if a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant.

■ The factors to be considered in determining dangerousness are similar to those used by the court in exercising its sentencing discretion. *United States v. Neary,* 552 F.2d 1184, 1192 (7th Cir.1977), *cert. denied,* 434 U.S. 864, 98 S.Ct. 197, 54 L.Ed.2d 139 (1977). The defendant need not be found dangerous in the sense of having a propensity to cause physical harm; it is sufficient if the evidence shows he has no regard for the law and the rights of the public. *United States v. Warner,* 572 F.2d 57 (2d Cir.1978), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978).

■ Here there is no question that Mr. Hondo was imprisoned for extremely serious offenses. They were violent crimes, and as of 1972 Mr. Hondo clearly had the propensity to act and react in a violent manner. Each conviction involved the use of a gun. The assault grew out of a street confrontation, and the murder occurred during a planned robbery. The nature and seriousness of these convictions are relevant to whether he should be sentenced as a dangerous special offender. *See United States v. Cox, supra,* at 288. The murder was committed while defendant was released on bail for the pending assault charge, an additional factor showing his disregard for the law.

These offenses took place during the summer of 1972, more than eleven years ago, and defendant has been incarcerated for almost the entire intervening period.

He has failed on his two parole experiences. His first parole, on June 15, 1982,

---

**3.** Section 3575(e)(1) states as follows:

A defendant is a special offender for purposes of this section if—

(1) the defendant has previously been convicted in courts of the United States, a State, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof for two or more offenses committed on occasions different from one another and from such felony and punishable in such courts by death or imprisonment in excess of one year, for one or more of such convictions the defendant has been imprisoned prior to the commission of such felony, and less than five years have elapsed between the commission of such felony and either the defendant's release, on parole or otherwise, from imprisonment for one such conviction or his commission of the last such previous offense or another offense punishable by death or imprisonment in excess of one year under applicable laws of the United States, a State, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency or instrumentality thereof ...

lasted approximately one month, and his second attempt at parole and the 180 Degree Halfway House program lasted approximately two weeks (February 8–21, 1983). He left the program in violation of the rules and was arrested on March 16, 1983. These incidents show defendant's continuing inability to accommodate himself to external rules.

Within five weeks of leaving prison defendant committed the offense to which he has pled guilty, receiving a firearm as a convicted felon. This time interval is significant. A minimal amount of time between release and a subsequent criminal act may show that the defendant will remain a danger unless incarcerated. *United States v. Cox, supra*, at 288. Notice that possession of a firearm was illegal was given to defendant when he was released on parole, and no matter why he received the gun, he knew it was against the law. That it was the same type of gun used in his prior offenses and that he also had ammunition for it in his possession are troubling facts. Even if his story, that he was only holding these items for a friend, were believed, it would not auger well for the future. The combination of weapon, ammunition, and surgical gloves suggest planned criminal activity, and association with someone involved in crime so soon after leaving prison would not be encouraging. It should be noted, however, that Mr. Hondo's personal belongings were commingled with these items.

Moreover, Mr. Hondo's conduct on March 16, 1983 showed complete disregard for the law and the safety of others. He seriously endangered others by speeding through busy city streets to avoid arrest. He violated a number of traffic laws in the process and then fled on foot. He gave a false name when finally apprehended.

Mr. Hondo states that he has changed, and the court is prepared to believe he is not the same as when he entered prison. He is now 35 years old. Not only is he above average in intelligence, but he has other positive qualities. He is a forceful speaker and has a certain charisma. He is interested in organizations and in leadership, and he has potential leadership capacity. Society has changed in many ways since he went to prison, however, and he has an unrealistic attitude about the kind of work he would like. Generally one cannot just step into leadership positions without first doing less inviting work or completing special training. For whatever reason, he has not been able to complete educational opportunities presented in prison.

The court recognizes in Mr. Hondo a potential that he has not yet been able to achieve. Unfortunately the record indicates that he is not able at this time to suppress those parts of his personality that have caused his antisocial behavior. Mr. Hondo's feelings about hypocrisy and bigotry are not unrelated to reality, but they do not justify resorting to crime.

■ No one is expert at predicting future actions, but the record before the court must lead to a conclusion, by more than a preponderance of the evidence, that Mr. Hondo is "dangerous" within the meaning of § 3575(f). There is no question that he was imprisoned for particularly serious crimes, characterized by gratuitous violence. His almost immediate failure in his two attempts at parole, the commission of the instant offense so soon after leaving prison, and the circumstances surrounding this offense and his arrest all show a continuing disregard for the law and the rights of the public. Dr. Malmquist's evaluation of the defendant is consistent. Mr. Hondo is not yet able to control his antisocial impulses.

While it cannot be predicted exactly when, if ever, he will gain that capacity, there are indications that he may. Indeed the court hopes that he will be able to reassess his situation, to grow, and to channel his considerable abilities in a productive way. The court agrees with Dr. Malmquist that he could benefit from psychiatric and psychological counseling and that it will be important to assure assessment of his psychic state, periodically and before his release from confinement.

■ On the present record the court finds that a period of confinement longer than the five years provided for the instant

offense is required for the protection of the public from further criminal conduct by the defendant.[4]  He should therefore be sentenced pursuant to 18 U.S.C. § 3575(b) to an appropriate term not disproportionate in severity to the maximum term otherwise authorized by law for a violation of 18 U.S.C. § 922(h)(1).[5]

**4.**  Defendant's counsel argues that the potential for further state incarceration, on his original sentences and a pending state charge connected with the events of March 16, 1983, is sufficient protection of the public interest.  There is no way of knowing, however, what further imprisonment may be imposed by state authorities.

**5.**  In determining what sentence is proportionate within the meaning of the statute, the court may consider the nature of the offense, the legislative purpose behind the act, and other experi- ence under sentence enhancing laws.  *See United States v. Williamson,* 567 F.2d 610 (4th Cir. 1977).  The case law also provides some guidance on what other courts have found to be within the statutory limit.  For example, sentences under the statute for possession of a firearm by a felon, in violation of 18 U.S.C. § 1201(a)(1), have been upheld where the sentence was enhanced as much as three or four times.  *See id.; United States v. Cox, supra.*